[L. A. No. 24551. In Bank. May 16, 1958.]

MANCHESTER AVENUE COMPANY (a Corporation), Appellant, v. H. W. STEWART, as Director of Employment, etc., Respondent.

VIRGINIA COUNTRY CLUB (a Corporation), Appellant, v. H. W. STEWART, as Director of Employment, etc., Respondent.

Clock, Waestman & Clock and John G. Clock for Appellants.

Edmund G. Brown, Attorney General, Irving H. Perluss, Assistant Attorney General, and Vincent P. Lafferty, Deputy Attorney, General, for Respondent.

McCOMB, J.—After trial before the court without a jury in consolidated actions to recover unemployment insurance taxes paid under protest, plaintiffs appeal from a judgment for defendant.

The facts in both cases are similar. Plaintiff Manchester Avenue Company owns and operates a golf course known as the Inglewood Country Club. Plaintiff Virginia Country Club owns and operates a golf course.

Some of the golfers on plaintiffs' courses engage caddies to carry their clubs and help look for golf balls which the players might hit into the rough. At the two courses a number of caddies are available for players who desire their services. The caddies are not told when to report but come when they want to work. The caddies are paid by the players, not by plaintiffs. There is no restriction on the amount that can be paid, except that at the Inglewood course a minimum fee has been established by the club for the protection of the caddies. Neither club pays a caddie who comes in search of work but is not hired by a player.

Each player has the right to select his own caddie or to carry his own clubs if he so desires. In fact, most players carry their own clubs on golf carts. If a player desires a caddie but expresses no choice, a caddie is assigned to him on the basis of "first-come first-out" (but at the Virginia Club it is the practice to give preference to regular caddies). A caddie has the right to refuse to go with any player.

Each club maintains facilities where the caddies wait until they are called. They are required to register when they arrive and are not allowed on the practice or playing area of the course while not caddying. They are limited at such times to the area reserved for them. Caddies are not allowed to solicit employment from the players, and swearing, gambling, and the use of intoxicating liquors are prohibited. The golf pro or caddie master has the power to enforce these regulations by dismissing a caddie or by keeping him waiting while others go out.

In 1952 assessments were levied against plaintiffs for unemployment insurance taxes on the amounts the caddies had received from the players. After exhausting their administrative remedies, plaintiffs paid the taxes under protest and filed the present suits to recover the funds paid.

On the basis of the foregoing facts, the trial court found that it was not true that plaintiffs did not direct and control the manner and means of the performance of the caddies' services and made its conclusions of law to the effect that the caddies were employees of plaintiffs and that plaintiffs were therefore not entitled to recover.

Question: *Do the provisions of the Unemployment*

*Insurance Code apply to services performed in caddying or carrying a golf player's clubs by an individual who was not in the employ of the golf club or association?*

*No.* The following is a brief history of the unemployment insurance tax as it relates to caddies:

i. The Federal Social Security Act was passed by Congress, effective on August 14, 1935. (49 Stats. 620 (1935).) The California Legislature, anticipating the enactment of the federal statute, passed an Unemployment Insurance Act on June 25, 1935. (Stats. 1935, ch. 352, p. 1226.)

The Social Security Act and the State Unemployment Insurance Act are designed to encourage a uniform system of unemployment compensation by the states and the establishment of the federal-state plan whereby the details of administration are left to the various states. (See section 2 of the state act passed in 1935.) Under both acts, administrative boards are empowered to promulgate rules, regulations, and administrative interpretations.

ii. In 1936 the Federal Social Security Board adopted a rule specifically applicable to caddies, which provided that where services are performed by caddies for members of a club and the caddies are compensated, either directly or indirectly, for such services by the club members, the club will not be required to pay the tax imposed by section 901, title IX, of the Social Security Act with respect to such payments to the caddies. This was true even though the caddies might be the club's employees. But if they performed any services for the club for which the club itself compensated them, then the club was subject to the tax. (S.S.T. 56, C.B. XV-2, 393 (1936).)

iii. On or about May 9, 1939, Prentice-Hall, Inc., published a letter addressed to it from the California Unemployment Reserves Commission (defendant's predecessor) as follows:

"You inquire whether this Department concurs with the opinion set forth in S.S.T. 56, in which the Bureau of Internal Revenue held that:

" 'Where services are performed by caddies for members of the M Club and they are compensated either directly or indirectly for such services by the club members, the club will not be required to pay the tax imposed by the Social Security Act with respect to such payments to the caddies, even though the caddies may be its employees. If, however, the caddies perform any services for the club for which the club, itself, compensates them, the club is subject to the tax.'

"We concur in the above statement."

iv. On December 5, 1940, a Codified Interpretive Opinion was issued by the Department of Employment, entitled "Status Under the Unemployment Insurance Act as Employees or Independent Contractors of Golf Caddies." In this opinion the Department of Employment, under the "specific facts set forth and not to be considered applicable to dissimilar factual situations," held, in effect, that caddies are employees of the golf club although paid directly by the members.

v. On October 31, 1942, the California Employment Commission rendered a unanimous decision in the case of Midwick Country Club (Commission Tax Decision No. 29), in which it held that caddies were not employees of that club but independent contractors upon the facts relating to that club, which facts were almost exactly parallel with those in the instant cases.

vi. On August 3, 1943, the California Unemployment Commission issued another unanimous decision in the case of Presidio Golf Club (Commission Tax Decision No. 321), in which it ruled that the caddies at that club were not employees subject to the Unemployment Insurance Act upon facts almost identical to those in the instant cases.

vii. Effective as of February 25, 1944, there was incorporated in the official California Department of Employment Tax Manual, paragraph 9030.04, the following: "Caddie fees: Former Rule 8.4 repealed effective January 1, 1938 deemed fees received by caddies from player on a public or private golf course or from the owner or operator thereof not to be a wage even though the caddie was subject to the direction and control of the caddie master. Since January 1, 1938, caddie fees have been considered a taxable wage under the act when paid to a caddie by the owner or operator of the golf course and provided he stood in an employment relationship with such owner or operator. (For caddies as employees, see Paragraph 7005.18.)"

viii. During the 1943 regular session, Assembly Bill No. 1544, as amended by the Senate May 5, 1943, was adopted by both houses of the California Legislature. It provided:

"Sec. 1. Section 7.6 is added to the Act cited in the title hereof to read, 'The term "employment" does not include services performed by any person in either caddying or carrying a golf player's clubs.' "

ix. The 1953 session of the Legislature enacted Senate Bill 901, which added section 651 to the Unemployment In-

surance Act, reading as follows: " 'Employment' does not include services performed in caddying or carrying a golf player's clubs by an individual who is not in the employ of the golf club or association." (Stats. 1953, ch. 1751, p. 3508.) There was also contained in Senate Bill 901 section 4, which read: "This act is declaratory of the existing law and the administrative interpretation thereof which is in conformity with the federal law and is not intended and shall not be construed as effecting any change therein." (Stats. 1953, ch. 1751, p. 3508.)

x. Subsequent to this enactment, the California Unemployment Insurance Appeals Board handed down decisions in the cases of these two plaintiffs, upholding the assessments upon which they now claim refunds.

xi. During a 1954 session of the Legislature, the Senate enacted the following resolution:

"Relative to usurpation of administrative powers by the Department of Employment and the California Unemployment Insurance Appeals Board.

"WHEREAS, The Legislature enacted Senate Bill No. 901 at the 1953 Regular Session which became Chapter 1751 of the Statutes of 1953; and

"WHEREAS, This bill added Section 651 to the Unemployment Insurance Code to provide that caddies were exempt from the taxing and benefit provisions of the unemployment insurance program; and

"WHEREAS, The Legislature in enacting such provision expressly declared in the bill that it was its intent that such measure was declaratory of the existing law and the administrative interpretation thereof which is in conformity with the federal law; and

"WHEREAS, Caddies were exempt under federal law and interpretation, where the caddies are paid by the players; and

"WHEREAS, The existing administrative rulings of the department at the time of the enactment of Senate Bill No. 901 had not regarded caddies as in employment except under circumstances where the caddies were paid by the club or association; and

"WHEREAS, The Department of Employment and the Unemployment Insurance Appeals Board, since the enactment of Senate Bill No. 901, have refused to recognize the intent of the Legislature, expressed therein; now, therefore, be it

"*Resolved*, That the Senate of the State of California hereby declares that it was the intention of the Senate in initiating Senate Bill No. 901 of the 1953 Session, and of the Legislature

in enacting that bill, to enact into law what it believed to be the existing administrative interpretation of the Department of Employment and what it knew to be the law with respect to the administrative interpretation of federal authorities administering the Federal Unemployment Tax Act, to the effect that caddies who are paid by the individual golf players rather than by the golf club should not be deemed to be employees of the club under the California Unemployment Insurance Act; and be it further

"*Resolved*, That the Secretary of the Senate is directed to transmit copies of this resolution to the Director of Employment, to the Deputy Director of Employment, and to each member of the California Unemployment Insurance Appeals Board.

"Resolution read, and, on motion of Senator O'Gara, unanimously adopted." (S. Res. 16, S. Jour., 1954 1st Extra Sess., p. 249.)

xii. The California Legislature during its 1957 session amended section 651 of the Unemployment Insurance Code to read as follows: " 'Employment' does not include services performed by an individual as a golf caddy in caddying or carrying a golf player's clubs." (Stats. 1957, ch. 595, p. 1691.)

In view of the foregoing legislative history, it is clear that the Legislature did not intend to include services performed by an individual as a golf caddie, and paid for solely by a member of a golf club, within the meaning of the word "employment," as used in the Unemployment Insurance Code.

The evidence in the present cases discloses that there is some control over the caddies by either the caddie master at the Virginia Country Club or the starter at the Inglewood course while the caddies are on and around the clubs' premises awaiting an opportunity to caddie. However, the evidence further shows that after a caddie has been engaged by a player, the player has exclusive control over the details of his work, and no one connected with plaintiffs has any control over the services rendered by the caddie at any time. The control exercised by plaintiffs over the caddies falls under the principle of law known as "control of the premises" and is to be distinguished from the control which the golf-playing member has over the caddie.

If rules are made only for the general control of conduct of a person while on the premises of another, mere conformity to such rules does not indicate or establish that the

persons involved are employees of the person making the rules.

In the Restatement of the Law of Agency (1933), section 220, page 489, Comment h, it is stated: "If . . . rules are made only for the general policing of the premises . . . mere conformity to such regulations does not indicate that the workmen are servants of the person making the rules."

The relationship between plaintiffs and the caddies was similar, if not in fact identical, to the relationship between a union hiring hall and the union members. A union member looking for work goes to the hiring hall and is assigned to a job, but no one seriously contends that the union is the employer.

In the case of both plaintiffs, persons came looking for an opportunity to caddie. At the Inglewood course the caddies were assigned on a first-come first-out basis. They were not given any particular preference except when a player desired a special caddie, in which case he would be called regardless of whether he was next on the list or not. Likewise, the caddie could refuse to go with the player if he did not care to go.

At the Virginia course practically the same policy was followed except that there were a few regulars who, because they were generally there first, were given the opportunity of going out first. The first-come first-out system was employed to avoid preferments or misunderstandings among the caddies as to the order in which they were to be called. It tended toward harmony and decorum, which are essential in the maintenance of an efficient golf course with several hundred players.

The primary function of the caddie was to carry the golf player's clubs from the beginning to the finish of the player's game. All the duties performed by the caddie while pursuing that function were at the sole and exclusive direction of the player. The player alone told his caddie what he wanted him to do while carrying the clubs. No one connected with plaintiffs had a right, or ever attempted, to interfere in any way after the game started. This placed the caddie under the control of the player as to the "means and method of performing the work," and not under the control of plaintiffs.

The evidence likewise fails to reveal any specific contract of hire between plaintiffs and the caddies, either express or implied. The mere fact that a person is allowed access to a golf course solely by sufferance of the club, so that he may become a caddie, does not create an employer-employee relationship. Plaintiffs merely granted permission to persons to come to the clubs and offer their services to players. They

were not hired by the clubs but merely permitted to avail themselves of the facilities provided by the clubs. They were not paid by the clubs out of club funds, but entirely by cash, either directly or indirectly, by the players.

An examination of the record reveals that there was a total absence of any evidence that anyone connected with either plaintiff did, or had the right to do, anything toward directing the control of the means and manner of performing the task of caddying. Therefore, the court's finding that plaintiffs did exercise such control is unsupported by any evidence, and its conclusions of law that the caddies were employees of plaintiffs and that plaintiffs were not entitled to recover are erroneous.

*Claremont Country Club* v. *Industrial Acc. Com.*, 174 Cal. 395 [163 P. 209, L.R.A. 1918F 177], relied on by defendant, is not applicable to the present case for two reasons:

1. The cited case was decided in 1917 under the Workmen's Compensation Act a long time prior to the enactment of any Unemployment Insurance Act and merely held that a caddie working at the club was subject to the Workmen's Compensation Act.

2. The instant cases are factually distinguishable from the Claremont Country Club case in the following respects:

*First.* In the Claremont case it appeared that the caddies were required to report for duty on specific days, while in the present cases there were no rules or regulations that the caddies were required to report for duty on specific days; in fact, the evidence was directly to the contrary, since they could come and go as they pleased.

*Second.* In the Claremont case the caddies were graded as to their efficiency, while in the present cases there was no such grading.

*Third.* In the Claremont case the player could not designate the caddie whose services he desired, while in the present cases the players were permitted to call for any caddie they wanted, and the caddie could go with any player he wanted.

*Fourth.* In the Claremont case the club kept an accurate record of the amount paid to each caddie by the players, while in the present cases there was no record kept of the amounts that were paid to the caddies.

*Fifth.* In the Claremont case the club provided the caddies, while in the present cases the clubs did not provide the caddies, as the men and boys merely came to both clubs inquiring if there was any chance for them to go out on the course caddy-

ing. In the present cases the caddies who came to the clubs were not required to stay there for any particular time and were never paid if they did not get a job. There was no way of telling from one day to the next how many caddies were going to be there or how many players would want their services. Moreover, if the players wanted to, they could bring their own caddies, carry their own clubs, or use hand caddie carts.

It thus appears that the reasoning followed by the court in the Claremont case is not applicable to the facts in the present cases.

Furthermore, in the Claremont case the court felt that the club could direct the caddies to do some work while not caddying. No such relationship existed with the caddies in the present cases. There is no evidence whatever that the caddies were required to perform any services for the clubs while awaiting a chance to go out with a player. The evidence is also without conflict that the caddies were not subject to direction or control by plaintiffs, insofar as any duty or service to the golf-playing member was concerned, while actually caddying.

Unlike a waiter in a restaurant or a house servant (these being the illustrations used by the court in the Claremont case), the caddies in the instant cases could come and go as they pleased. They were not paid for coming or waiting. If they did not get a call to go out with a player, they received nothing. On the other hand, a servant or waiter is paid during the time he is on duty even if he is not serving a guest or patron.

In addition, a guest or patron cannot discharge a servant or waiter. This can be done only by the employer. In the present cases, a caddie could be relieved or discharged by a player, but not by either of the plaintiffs, at any time the player desired from the beginning to the finish of his game.

The judgment is reversed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.