GENERAL PUBLIC UTILITIES CORPORATION, Jersey Central Power & Light Company, Metropolitan Edison Company, and Pennsylvania Electric Company, Plaintiffs,

v.

The BABCOCK & WILCOX COMPANY and J. Ray McDermott & Co., Inc., Defendants.

No. 80 Civ. 1683.

United States District Court, S. D. New York.

Sept. 29, 1982.

---

Kaye, Scholer, Fierman, Hays & Handler, New York City, for plaintiffs; David Klingsberg, New York City, of counsel.

Davis, Polk & Wardwell, New York City, for defendants; Robert B. Fiske, Jr., New York City, of counsel.

## OPINION AND ORDER

OWEN, District Judge.

This action arises out of calamitous events occurring at the Pennsylvania nucle-

ar electric generating facility known as Three Mile Island Unit No. 2 ("TMI") on March 28, 1979.

Plaintiff General Public Utilities Corporation, ("GPU"), and the other named plaintiffs, owners and operators of the facility, in sum, claim that defendant Babcock & Wilcox, ("B&W"), manufacturer of the nuclear system, is liable to them for some four billion dollars in damages on account of B&W's failure to warn them of known safety hazards in the nuclear steam supply system ("NSSS") which GPU purchased from B&W. GPU has not included any claims for relief based upon contract law in its amended complaint. Rather, it has enumerated five tort claims alleging that B&W is liable under Pennsylvania law of strict liability, ordinary negligence, gross negligence, and reckless misconduct.

B&W disputes GPU's allegations claiming that the personnel of GPU were given appropriate instructions which, if followed, would have corrected the operating malfunction that brought about the accident. B&W also contends that the accident was caused by GPU's own negligence in improperly maintaining the equipment, in failing to adequately train their operators, and in failing to follow their own procedures.

■ Before me today is B&W's motion for partial summary judgment. B&W seeks a ruling (1) that by reason of certain provisions in the contract of sale, GPU cannot in any event recover in ordinary negligence for damages other than repair or replacement of defective equipment, and (2) that under Pennsylvania law,[1] GPU may

---

1. Pennsylvania law clearly governs the contract issues in this case. GPU and B&W included a choice of law clause in the NSSS Agreement and therein selected Pennsylvania law to govern, NSSS Agreement, Amendment No. 1, para. 5. Where, as here, the jurisdiction chosen bears a reasonable relationship to the contract, I am constrained to respect the contractual choice. *A. S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957).

   As to the tort issues, the parties apparently agree that either Pennsylvania or Virginia law governs. However, because Virginia has not adopted the strict products liability doctrine,

they argue this motion assuming that Pennsylvania law will apply. Of course, as a federal court sitting in New York, I must follow New York state choice of law rules. *Klazon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). In a tort case, New York conflict of law rules provide that the law of the state with the most substantial interest in the controversy will apply. *Neumeier v. Kuehner*, 31 N.Y.2d 121, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972); *Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). For the purpose of resolving the strict liability issue on this motion, I apply Pennsylvania law.

not assert a claim on these facts on the theory of strict liability. For the reasons set forth hereafter, B&W is granted summary judgment to the extent of dismissing GPU's claim for relief based upon a theory of strict liability. B&W's motion is, however, otherwise denied.

I turn first to plaintiff's strict liability claim. Courts of Pennsylvania have adopted the strict products liability doctrine as stated in Section 402A of the Restatement (Second) of Torts, *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966), and have applied it in cases alleging such things as design defects and failures to warn, claims obviously analogous to those alleged by GPU. *See, e.g., Greiner v. Volkswagenwerk Aktiengeselleschaft,* 540 F.2d 85 (3rd Cir. 1976); *Mattocks v. Daylin, Inc.,* 78 F.R.D. 663 (W.D.Pa.1978).

The strict liability doctrine evolved for the following reasons: the lack of contractual privity between manufacturer and ultimate user, *MacPherson v. Buick Motor Co.,* 217 N.Y. 382, 111 N.E. 1050 (1916); the relatively unequal strengths of buyer and seller at the bargaining table, *Scandinavian Airlines System v. United Aircraft Corp.,* 601 F.2d 425 (9th Cir. 1979); the difficulty faced by a consumer in proving negligence on the part of the manufacturer where the consumer is several steps down the distribution chain and the evidence of negligent production is exclusively within the control of the manufacturer, *Scandinavian Airlines System, supra;* the ability of the manufacturer to more efficiently distribute the risk of loss among all of its purchasers, *Scandinavian Airlines System, supra;* and the deterrent value of placing the risk of loss on the manufacturer because it is "better able to ... correct flaws that pose danger" before those flaws cause accidents. *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1172 (3rd Cir. 1981). Absent such a legally mandated allocation of risk, an unwitting purchaser, in spite of the fact that he plays no part in the design and assembly of the product—such as an automobile—he purchases, must bear the entire loss in the event he is unable to prove negligence.

▮ Nevertheless, these same criteria that prompted the evolution of the doctrine necessarily establish guidelines for its applicability. To this end, B&W cites *Kaiser Steel Corp. v. Westinghouse Electric Corp.,* 55 Cal.App.3d 737, 127 Cal.Rptr. 838 (2d Dist. 1976), contending that the strict liability doctrine does not apply in this case or in any case

> [b]etween parties who: (1) deal in a commercial setting; (2) from positions of relatively equal strength; (3) bargain the specifications of the product; and (4) negotiate concerning the risk of loss from defects in it.

127 Cal.Rptr. at 845. GPU, on the other hand, cites *Caterpillar Tractor, supra,* and contends that Pennsylvania does not recognize the so-called *Kaiser Steel* exception and that, even if it does, the exception does not apply to our case. While the Pennsylvania courts have not spoken precisely on the subject, I find every indication in the Pennsylvania authorities that strict liability would not be applied to GPU's purchase of the NSSS from B&W. This conclusion is also in accord with my own view, had this case been before me on first impression.

Thus, with reference to the five criteria supporting the doctrine, I find: (1) that there is contractual privity between GPU and B&W and therefore the parties were in a position to allocate risk; (2) that they are both large corporations coming to the bargaining table in positions of relatively equal strength; (3) that because of GPU's participation in the drafting of specifications for the NSSS, its necessary expertise in the operation of the plant, and the nature of its negligence claim, *i.e.,* B&W's alleged failure to warn it of known safety hazards, GPU is not as a practical matter at a disadvantage in endeavoring to prove negligence on B&W's part; (4) that GPU is better situated to distribute the risk of loss among its consumers than B&W is to distribute that risk among its purchasers; and (5) that GPU's participation in both the design of the NSSS and its operation places it in a position tantamount to B&W's in terms of

ability to recognize and correct danger producing flaws. For that reason, the rationale of deterrence that applies, for example, in the sale of a car from the floor of an automobile showroom does not extend to the purchase of a product as specialized as the NSSS. The parties here are not a multi-million dollar automobile manufacturer and an ordinary member of the public, but "are commercial enterprises contracting from positions of relatively equal bargaining power for a product designed to negotiable specifications and not furnished off the shelf." *Kaiser Steel, supra,* 127 Cal.Rptr. at 845.

GPU's contention, however, is that in *Caterpillar Tractor* the Court of Appeals for the Third Circuit considered the Kaiser Steel approach to strict liability and rejected it. I disagree. In *Caterpillar,* a frontend loader was severely damaged by a fire in its hydraulic system caused by an allegedly unreasonably hazardous design defect. The Court of Appeals, as I see it, was at most called upon to decide whether plaintiff was restricted to its contractual and warranty remedies for "economic loss"—barred by the statute of limitations—or whether "Pennsylvania would permit the purchaser of a defective product to recover for this type of damage in an action founded solely on tort theories of products liability and negligence." *Caterpillar Tractor, supra,* 652 F.2d at 1166. The criteria for applicability of the strict liability doctrine in Pennsylvania was not before the *Caterpillar* court.

Given the foregoing, B&W's motion for summary judgment on the issue of strict liability is granted and GPU's fifth claim for relief based upon that theory is dismissed.

I next turn briefly to B&W's claim of contractual limitation of its liability. In the course of their dealings, GPU and B&W entered into three relevant contracts which govern, at least in part, relations between the parties. The first of these, the "NSSS Agreement" was executed in the fall of 1970. It specifies the equipment and services GPU was to purchase from B&W, the price, and all other terms of sale. The "Master Services Contract" was entered into by the parties in 1974 and sets out the general terms and conditions under which the parties agreed to do business. Finally, in 1975, the parties entered into a "Long Term Training Contract" which covers training courses offered by B&W with regard to the operation of the NSSS.

B&W now points to three clauses in the NSSS Agreement (and to analogues of those clauses in the other agreements) which, it contends, limit GPU's right to recover damages from B&W for any injury to that of repair or replacement of defective equipment. I set out the text of those clauses below.[2] B&W's is certainly an arguable position. GPU, on the other hand, contends that at a minimum this issue is not ripe for decision on summary judgment be-

**2.** Article XII of the NSSS Agreement is titled "Consequential Damages" and reads:

B&W shall not be liable in any event for loss of anticipated profits, loss by reason of Plant shutdown, non-operation or increased expense of operation of other equipment, or any special or consequential loss or damage of any nature arising out of the construction or operation of the Plant.

Article VII of the NSSS Agreement is titled "Indemnity and Insurance" and subsection A.(4) of that provision reads:

[GPU] indemnifies and holds harmless B&W and its suppliers and subcontractors against all losses, claims, damages or liabilities arising out of or based upon bodily injury (including death at any time resulting therefrom) and loss of or damage to any property located on or off the Plant site whenever or wherever occurring, when due to the negligence of [GPU] or its employees or agents in the performance of this contract or in the operation of the Plant, or regardless of negligence when resulting in whole or in part directly or indirectly from nuclear reaction, nuclear radiation, or radioactive contamination resulting from incidents at the site, whether controlled or uncontrolled.

Article V of the NSSS Agreement is titled "Plant Warranties" and subsection A.(1) contains a performance warranty measured by the amount of power the system was to produce. Subsection B.(1) establishes a quality warranty which expressly provides, among other things, that the equipment will be "free from defects in design, workmanship, or materials" for one year after acceptance.

cause issues of fact remain as to the intended meaning of these clauses of the contracts. This position is arguable as well. "Where contractual language is susceptible of at least two fairly reasonable interpretations," summary judgment is not appropriate. *Aetna Casualty & Surety Co. v. Giesow,* 412 F.2d 468, 471 (2d Cir. 1969). This is particularly true here in light of the Pennsylvania policy of strict construction of exculpatory clauses. *Dilks v. Flohr Chevrolet, Inc.,* 411 Pa. 425, 192 A.2d 682 (1963). B&W's motion for summary judgment of the contractual limitation issue is therefore denied.

The foregoing is so ordered.