1998-NMCA-092

963 P.2d 552

**Ronald Dale MADSEN and Terrisa Ruth Madsen, individually and as Personal Representatives of the Estate of Jason Madsen, Deceased, Plaintiffs–Appellants,**

v.

**Shawn D. SCOTT, Defendant–Appellee.**

No. 17211.

Court of Appeals of New Mexico.

May 13, 1998.

Certiorari Granted July 7, 1998.

Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, for Plaintiffs–Appellants.

Robin E. Sabin, Victoria Davis Armstrong, Atwood, Malone, Turner & Sabin, P.A., Roswell, for Defendant–Appellee.

## OPINION

PICKARD, Judge.

{1} This case requires us to consider under what circumstances a housesitting arrangement will create an employer-employee relationship such that a homeowner may be held vicariously liable for the negligent acts of the housesitter. As a related issue, we consider whether an employee's failure to act can be an omission occurring within the scope of employment.

{2} Plaintiffs brought suit seeking damages for the injury and wrongful death of their son, Jason Madsen, as the result of a shooting at Shawn Scott's home. The trial court entered summary judgment on Scott's motion, finding that Scott's housesitting arrangement with two brothers did not create an agency relationship such that Scott could be held vicariously liable for their negligence. On appeal, Plaintiffs present two issues: (1) whether the housesitting arrangement in this case could create an employer-employee relationship; and (2) whether Scott's instruction to his housesitter not to let anyone touch his guns, and the housesitter's failure to carry out that instruction, could constitute negligence for failure to act. We answer both questions in the affirmative and reverse.

## FACTS

{3} In January 1992, Shawn Scott (Homeowner) planned to take an out-of-town trip. Homeowner engaged Melvin Franklin

(Melvin) to take care of his home. Homeowner and Melvin were good friends and worked together at a doughnut shop. Prior to leaving on his trip, Homeowner took Melvin to his home and instructed him to stay at the house, water the plants, not to have any wild parties, and not to let anyone, other than Melvin, touch his guns. Both Homeowner and Melvin had an interest in guns. Homeowner collected guns as a hobby and would take them shooting. Melvin also owned guns and would use them for hunting and shooting. At the time Homeowner was out of town, he left behind five rifles in an unlocked gun case. On top of the gun case was a .22 pistol. However, the guns were unloaded and no ammunition was left in the house. Homeowner told Melvin that if he wanted to take the guns out shooting he would have to bring his own ammunition.

{4} A few days after Homeowner left, he called to check on his house. Melvin's deposition equivocated as to whether Homeowner asked Melvin if anyone was touching his guns. Melvin testified that Homeowner "may" have asked such a question. When asked, "What did [Homeowner] say," Melvin responded, "He just wanted to know if the guns—." Melvin then rephrased the answer to, "he probably would have just asked" if anyone touched the guns. At the time of that conversation, Melvin asked Homeowner whether Melvin's brother Richard Franklin (Richard) could also stay at the house. Homeowner gave his permission for Richard to stay at his home. Homeowner knew Richard, as he worked at the doughnut shop with Homeowner and Melvin. Homeowner also knew that Richard had an interest in guns. Richard had previously sold a gun to Homeowner and on one occasion, Richard had taken a gun he had purchased to the doughnut shop to show Homeowner.

{5} On January 26, 1992, while the brothers were staying at the house, they invited Jason Madsen (Jason) and two female friends over to watch the Super Bowl. Prior to the party, Richard and Jason had gone shooting with Richard's gun. During the party, Richard and Jason continued to play with guns, and guns were at various locations in the living room. Richard left his .38 pistol on the TV, and Homeowner's Daisy Pistol was on the coffee table along with ammunition. Richard also took Homeowner's .22 from the gun rack in the living room.

{6} During the time that Richard and Jason were playing with the guns, Melvin was also in the living room. Richard was sitting on a sofa a few feet from where Melvin was lying with his head resting on the sofa, watching TV. During the Super Bowl game, Richard and Jason decided to play "quick draw." Jason had Homeowner's gun and Richard had his own gun. Jason told Richard that he wanted to draw first. Jason reached for his gun, and then Richard drew his gun and pulled the trigger, the gun fired, and Jason was shot and killed.

{7} Jason's parents brought this suit against Richard, who fired the fatal shot, and Homeowner. Melvin, the person responsible for housesitting, was not sued. Plaintiffs' complaint alleged that Richard was negligent and that Homeowner was also negligent for his acts and omissions, particularly in leaving the guns unsecured. Plaintiffs also filed an amended complaint stating that: (1) Richard and Melvin were the employees/agents of Homeowner, (2) Melvin was negligent in failing to control and supervise the use and misuse of Homeowner's weapons, and (3) Homeowner was vicariously liable for the negligence of Melvin and Richard. Homeowner answered the complaint and moved for summary judgment on the basis that under these circumstances, he owed no duty to Jason because he could not have reasonably anticipated the shooting. The trial court granted Plaintiffs' motion to amend the complaint and granted Homeowner's motion for summary judgment. In its ruling, the trial court stated that "a[ ] principal agent relationship did not exist between Shawn Scott and Melvin Franklin with respect to any of the circumstances contributing to the death of Jason Madsen."

## STANDARD OF REVIEW

{8} An award of summary judgment will be upheld if no genuine issues of material fact exist or the moving party is entitled to judgment as a matter of law. *See Sarracino v. Martinez*, 117 N.M. 193, 194, 870 P.2d 155, 156 (Ct.App.1994). We consider the facts

478

relating to each of the issues raised on appeal in the light most "favorable to support a trial on the issues because the purpose of summary judgment is not to preclude a trial on the merits if a triable issue of fact exists." *Ruiz v. Garcia*, 115 N.M. 269, 271, 850 P.2d 972, 974 (1993). In reviewing the grant of summary judgment, "we take note of any evidence in the record which puts a material fact in issue." *Gillin v. Carrows Restaurants, Inc.*, 118 N.M. 120, 122, 879 P.2d 121, 123 (Ct.App.1994).

## DISCUSSION—RESPONDEAT SUPERIOR

{9} The principal question before us is whether the trial court erred as a matter of law when it granted summary judgment. The trial court granted the motion for summary judgment based upon its determination that Homeowner owed no duty to Jason because Homeowner did not have an employer-employee relationship with Melvin or Richard. Because the trial court determined that there was an absence of any relationship which would create a duty in Homeowner toward Jason, our first inquiry focuses upon the correctness of this conclusion.

{10} Homeowner contends that the housesitting arrangement with Melvin did not create an employer-employee relationship. Plaintiffs argue that an employer-employee relationship was created or, alternatively, that there are genuine material facts in dispute that would preclude summary judgment.

{11} If one or both of the brothers was an employee of Homeowner then, under the doctrine of respondeat superior, Homeowner may be held liable for the tortious acts of his employees which are done in the scope of their employment. *See Reynolds v. Swigert*, 102 N.M. 504, 507–08, 697 P.2d 504, 507–08 (Ct.App.1984); *see also Romero v. Mervyn's*, 109 N.M. 249, 254, 784 P.2d 992, 997 (1989) (respondeat superior applies "when the claim is based in tort and the plaintiff alleges the employer is liable for the conduct of an employee because the employee was acting within the scope of employment.")

## A. Right of Control

{12} In determining whether an employer-employee relationship exists, the employer must have someone perform work or a service and must have the "right to control the manner in which the details of the work are to be done, even though the right of control may not be exercised." UJI 13–403 NMRA 1998; *see also* Restatement (Second) of Agency § 220(1) (1958) ("A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control."). The fact that an employee does not receive any wages is not controlling. *See California First Bank v. State*, 111 N.M. 64, 70, 801 P.2d 646, 652 (1990) (an employer-employee relationship may be gratuitous); Restatement, *supra* § 225 cmt. a ("Consideration is not necessary to create the relation of . . . master and servant.").

{13} It is undisputed that Homeowner engaged Melvin to housesit. Homeowner asked Melvin to keep an eye on the house, to water the plants, and not to let anyone touch Homeowner's guns. Thus, Melvin was performing a service for Homeowner.

{14} However, the issue in contention is whether Homeowner had the right to control the manner in which the details of the work were to be performed. Homeowner contends that he did not have the right to control the manner in which the housesitting arrangement was carried out. Homeowner argues that the instructions he gave to Melvin to watch the house, to water the plants, and not to let anyone touch the guns were not specific or detailed enough to provide him with the right to control Melvin's performance of those duties. In support of his argument, Homeowner refers our attention to the Hawaii case of *Lai v. St. Peter*, 10 Haw.App. 298, 869 P.2d 1352 (1994).

{15} In *Lai*, the court considered whether a housesitting arrangement created an employer-employee relationship so as to hold the homeowner liable for the tortious acts of his housesitter. *Id.* 869 P.2d at 1357. The *Lai* court distinguished between the right to direct the manner in which the details of the

work are to be performed and rules which govern the general conduct of a person while on the property of another. *Id.* at 1357–58. The court held that a list containing general information about the operation of the house and requests was not sufficient to provide the homeowner control over the housesitter and thus create an employer-employee relationship. *Id.* at 1358.

{16} *Lai* is distinguishable from the present case. Most importantly, the facts are very different. *Lai* involved an arrangement in which the housesitter flew to Hawaii, paying her own expenses, for a vacation. *Id.* at 1357. The homeowner was going to be out of town during that period and allowed the housesitter to stay in his home. *Id.* at 1356. Moreover, the list of directions that the homeowner left did not appear to require the housesitter to do anything affirmatively for the homeowner other than water the plants. *Id.* at 1358. Rather, the list contained information regarding the daily operation of the home and other general information such as phone numbers. *Id.* As to the homeowner's request that the housesitter not wear shoes in the house, lie on the couch with wet or sweaty bodies, or leave valuables in the car, these requests were only to govern the conduct of the housesitter while she stayed in the home, were not related to any duty she was performing, and were not related to any negligence. *Id.*

{17} Additionally, *Lai* is also distinguishable because it appears to have been decided, in part, on the fact that the injury to the plaintiff caused by the housesitter occurred outside the "scope of employment." *Id.* The housesitter was driving the homeowner's car for her own personal use and not for any purpose related to the housesitting arrangement. *Id.* For reasons to be explained below, a factual issue is raised in this case whether Melvin was acting within or outside the scope of his employment.

{18} Nonetheless, Homeowner contends that his case is similar to *Lai* in that his instruction to Melvin regarding the guns was only to govern Melvin's conduct. We disagree. In this case, the instruction to Melvin not to let anyone touch Homeowner's guns appears to be part of the duties Melvin was

to perform and not an instruction to govern Melvin's conduct. This is so particularly when Homeowner's intent for giving this instruction was for the safekeeping of his guns—his "prized possessions." Moreover, a factfinder could find that when Homeowner called Melvin to check up on things, he inquired whether anyone had been touching his guns. Thus, considering the facts in the light most favorable to a trial on the merits, an issue of whether Melvin's duties included supervising the use or misuse of Homeowner's guns is raised.

{19} To be sure, Homeowner's instructions to Melvin concerning the housesitting arrangement were not very specific or detailed. However, we do not agree with Homeowner's argument that the specificity of the instructions given is the sole factor to be considered in determining whether an employer-employee relationship was created. Other factors must be considered in determining whether a housesitting arrangement created an employer-employee relationship. As Prosser explains:

> The traditional definition of a servant is that he is a person employed to perform services in the affairs of another, whose physical conduct in the performance of the service is controlled, or is subject to a right of control, by the other.

> This is, however, a great over-simplification of a complex matter. In determining the existence of "control" or the right to it, many factors are to be taken into account and balanced against one another—the extent to which, by agreement, the employer may determine the details of the work; the kind of occupation and the customs of the community as to whether the work usually is supervised by the employer; whether the one employed is engaged in a distinct business or occupation, and the skill required of him; who supplies the place and instrumentalities of the work; the length of time the employment is to last; the method of payment, and many others.

W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 70 (5th ed.1984) (footnote omitted).

{20} Our case law recognizes a similar proposition. As the Court in *McCauley v. Ray* acknowledged:

"Although control or right to control the physical conduct of the person giving service is important and in many situations is determinative, the control or right to control needed to establish the relation of master and servant may be very attenuated. In some types of cases which involve persons customarily considered as servants, there may even be an understanding that the employer shall not exercise control. Thus, the full-time cook is regarded as a servant although it is understood that the employer will exercise no control over the cooking."

*McCauley v. Ray*, 80 N.M. 171, 180, 453 P.2d 192, 201 (1968) (quoting Restatement, *supra* § 220 cmt. (d)(1)).

{21} The customs related to the supervision of the type of work being performed must be considered. A housesitting arrangement assumes that the homeowner will be gone and will not be present to supervise the details of the arrangement. Moreover, the homeowner supplies the instrumentalities of the work—the home. This is the object of the relationship—to safekeep the home—and is also the place where the work is to be carried out. Additionally, as noted previously, whether compensation is paid is not determinative; an employer-employee relationship may still be found even where no compensation is paid. *See California First Bank*, 111 N.M. at 70, 801 P.2d at 652.

{22} Finally, our case law has previously recognized a situation where a housesitting arrangement created an employer-employee relationship. *See State Farm Fire & Cas. Co. v. Miller Metal Co.*, 83 N.M. 516, 519–20, 494 P.2d 178, 181–82 (Ct.App.1971). Homeowner attempts to distinguish this case by arguing that the homeowner in *State Farm Fire & Casualty Co.* left very detailed instructions to the housesitter regarding a furnace. *Id.* at 519, 494 P.2d at 181. It was in failing to pay attention to those details that the injury in *State Farm Fire & Casualty Co.* was precipitated. Homeowner's attempt to distinguish *State Farm Fire & Casualty Co.* is unpersuasive. Just as the injury in

*State Farm Fire & Casualty Co.* was precipitated by the housesitter's failure to follow the involved instructions regarding the furnace, the injury in this case may be viewed as precipitated by the housesitter's failure to follow the less involved, but nonetheless specific, instruction not to let anyone touch the guns. Thus, it may be said that a master-servant relationship exists with "respect to the very thing from which the injury arose," *see Benham v. All Seasons Child Care, Inc.*, 101 N.M. 636, 638, 686 P.2d 978, 980 (Ct.App. 1984), making this case more like *State Farm Fire & Cas. Co.* and less like *Lai*.

{23} Further, as we have just discussed, many factors are to be taken into account in determining the right to control, not just the specificity of the instructions given to the purported employee. Thus, we hold that the trial court erred in granting summary judgment on the basis that Homeowner did not have a right to control Melvin.

### B. Scope of Employment

{24} Under the doctrine of respondeat superior, an employer is liable for an employee's negligent act only if the employee was acting within the scope of employment. *See* UJI 13–406 NMRA 1998; *Richardson v. Glass*, 114 N.M. 119, 122, 835 P.2d 835, 838 (1992); *Benham*, 101 N.M. at 638, 686 P.2d at 980. Therefore, assuming an employment relationship did exist in this case, the question now becomes whether the brothers were acting within the scope of their employment at the time of the accident.

{25} Homeowner argues that the brothers were furthering their own interests and engaging in horseplay at the time of the accident. *See* UJI 13–407 NMRA 1998 (defining scope of employment); *Rivera v. New Mexico Highway & Transp. Dep't*, 115 N.M. 562, 564, 855 P.2d 136, 138 (Ct.App.1993) (stating that the general rule is that an employer is not responsible for an employee's acts of horseplay because such acts are for the employee's personal amusement and not in furtherance of the employer's interests); *Valdez v. Warner*, 106 N.M. 305, 306, 742 P.2d 517, 518 (Ct.App.1987) (employee furthering his own interests is not acting within the scope of employment); *Benham*, 101

N.M. at 638, 686 P.2d at 980 (stating that for an employee's act to be within the scope of employment it must have been done with the intent to perform a service for the employer). Specifically, Homeowner contends that the brothers, by inviting guests over for a Super Bowl party, and by playing with a loaded gun brought onto the premises by Richard, had departed from their employment and Homeowner cannot be held liable for their actions. Accordingly, Homeowner argues, no reasonable trier of fact could conclude that Melvin or Richard were acting within the scope of their employment at the time of the accident. *See Rivera*, 115 N.M. at 564, 855 P.2d at 138 (stating that "when no reasonable trier of fact could conclude that an employee is acting in the course and scope of employment, summary judgment is properly granted").

{26} Plaintiffs do not dispute that Richard may have been engaging in horseplay at the time of the accident. Rather, Plaintiffs focus upon the actions of Melvin. Plaintiffs contend that at the time of the accident, Melvin was not participating in any horseplay but instead simply neglected to perform the specific duties given to him by Homeowner not to have wild parties and not to let anyone touch his guns. Plaintiffs explain that an employee's failure to act, where the employer has a duty to the person injured, renders the omission one occurring within the scope of the employment. The Restatement (Second) of Agency provides the rule in such cases.

§ 232. Failure to Act

The failure of a servant to act may be conduct within the scope of employment.

Comment:

a. *Necessity of duty of action by servant.* In order that the failure of a servant to act can constitute conduct within the scope of employment, for which the master is responsible, the servant must have duties to perform at the time and the master must owe to the person injured a duty that the servant should act.

Illustrations:

1. P employs A as a watchman from 8 P.M. to 6 A.M. to guard against fires and burglaries. During this period A discovers a fire on the premises which endangers the adjoining house of T, but neglectfully fails either to put it out or give the alarm. The fire spreads to T's house. A's conduct is within the scope of employment.

Restatement, *supra* § 232 cmt. a & illus. 1.

{27} The Restatement applies when the employer owes a duty to the injured person. Homeowner argues that he did not owe a duty to Jason. Homeowner contends that he did not know the brothers would invite underage guests to his house. This argument is unpersuasive. Homeowner expressly gave the brothers permission to invite guests over with one limitation—no wild parties. While the brothers invited only three guests and there were no drugs or alcohol, we do not believe it would be unreasonable for a factfinder to find that a party in which loaded guns are being casually played with is "wild."

{28} When an employee has the authority to invite a guest onto the employer's premises, then "a person so invited is a guest of the [employer]" and the employer owes a duty to the guest as an invitee. Restatement, *supra* § 242 cmt. b. The duty of a landowner to an invitee is a duty of ordinary care to keep the premises safe for the visitor. *See Ford v. Board of County Comm'rs*, 118 N.M. 134, 139, 879 P.2d 766, 771 (1994). Plaintiffs argue that Melvin failed to abide by the duty of ordinary care that he owed to Jason and Homeowner may be held vicariously liable for this failure. This situation is similar to Restatement, *supra* Section 232 Illustration 1 quoted above in which the employee, who had a duty to report the fire to the neighbor, failed to respond and this conduct was within the scope of employment. In this case, Melvin had a duty to prevent Richard and Jason from misusing the guns and his failure to do so, as in the example above, renders this an omission occurring within the scope of employment.

{29} Furthermore, the fact that Melvin was watching TV at the time and ignoring the conduct of his guests does not place his conduct outside the scope of his employment. As the Restatement (Second) of Agency Section 232 provides:

c. *Where servant acts for his own purposes.* Unless there is a non-delegable duty, the master is not responsible if the servant's failure to perform is due to the fact that at the time the servant has departed from his employment. *See* § 235. As in other situations, *it is a question of degree whether or not the servant has departed from the employment. The mere fact that at the time he is doing something for his own purposes so that he neglects to act for the master is not sufficient to prevent responsibility of the master for his failure to act.*

Illustration:

5. P employs A to drive his team. A leaves the team, properly hitched, by the roadside while he enters a tavern for the forbidden purpose of obtaining a drink. While in the tavern, he sees that the horses have become unhitched and are about to run away. He refrains from acting in order to finish his drink. A's conduct is negligent and within the scope of employment.

Restatement, *supra* § 232 cmt. c & illus. 5 (emphasis added).

{30} Nonetheless, Homeowner attempts to distinguish this illustration by noting that the instrumentalities that would cause harm, the horses, were the very thing that the servant was responsible for. In this case, Homeowner argues, the injury did not arise from the use of his gun. Rather, the injury occurred because Richard brought his own gun and his own ammunition onto the premises and then played a game of quick draw with Jason.

{31} Homeowner further argues that there was nothing inherently unsafe about the premises. The guns which he left in Melvin's care were unloaded and there was no ammunition in the house. Homeowner contends that the presence of guns alone is not sufficient to make a landowner liable for an injury occurring on the premises absent some knowledge that a person is reckless in the handling of guns. *See Lopez v. Chewiwie*, 51 N.M. 421, 424, 186 P.2d 512, 513 (1947). Homeowner explains that he could not have anticipated that anything like this would happen.

{32} However, Homeowner's arguments raise more questions than they answer and illustrate why this case is an inappropriate one to dispose of by summary judgment. Many factual questions are raised by the circumstances of this case, chief among them what Homeowner and Melvin knew regarding Richard's conduct with guns. Both Melvin and Homeowner knew that Richard had a great interest in guns. As Melvin stated, "part of being Richard's friend is [going] shooting." Melvin also knew that guns and ammunition were lying around the house, but took no action because it is normal for the brothers to have guns lying about, and it is normal for ammunition to be out when Richard is doing his "tricks."

{33} Homeowner's position also raises questions about what Melvin knew or should have known in regard to his brother's conduct leading up to the shooting. Melvin knew there were guns in the house. Also, one of Homeowner's guns was on the coffee table in the living room where Melvin was watching TV. Another gun was on top of the television that Melvin was watching. Ammunition was on the coffee table close to where Melvin was lying. Richard and Jason were also in the same room as Melvin when they began to play quick draw. Melvin claims that he did not know that the brothers were playing quick draw. However, the testimony shows that at the time of the shooting, Melvin was lying against the same sofa that Richard was sitting on—only a few feet away from where the game of quick draw was being played with one of Homeowner's guns. A question is raised whether Melvin should have known of the game but did not stop it or did know yet continued to watch TV, both of which would be contrary to the explicit instructions and duties that he was given.

{34} There are also issues of material fact raised as to whether Homeowner could have foreseen that someone could be injured by a gun. Homeowner knew that both brothers liked guns. In fact, Richard had previously taken a gun over to the doughnut shop to show Homeowner. It is reasonable to infer that Homeowner knew or should have known that by giving permission

for Richard to stay at the house, he might bring along some of his own guns, some of which might be loaded. Moreover, although Homeowner did not leave any ammunition in the house for his guns, he told Melvin he could bring his own ammunition if he wanted to take the guns out shooting. Thus, it is also reasonable to infer that Homeowner knew or should have known that there would be loaded weapons in his home.

{35} Homeowner also expressly gave the brothers permission to have guests at the house. It is reasonable to infer that Homeowner knew that the brothers would have guests in his home while the brothers also had their firearms with them. Yet, Homeowner did not prohibit the brothers from bringing their own guns; nor did he prohibit Melvin from handling guns in front of the guests. Finally, Melvin could be viewed as negligently performing his duties of having no wild parties when he allowed a game of quick draw to be played with loaded guns in his presence during a party. Viewing these facts in the light most favorable to a trial on the merits, we hold that there are genuine issues of material fact precluding summary judgment in this case.

## CONCLUSION

{36} Thus, because there are issues of material fact regarding whether an employer-employee relationship was created, whether Melvin was acting within the scope of his employment when he failed to act, and whether this type of accident was foreseeable by either Melvin or Homeowner, we reverse the trial court's order granting summary judgment.

{37} **IT IS SO ORDERED.**

WECHSLER, J., concurs.

ALARID, J., dissents.

ALARID, Judge, dissenting.

{38} Plaintiffs appeal entry of summary judgment in an action for wrongful death. Plaintiffs filed suit against both Richard, who fired the gun killing their son, and the owner of the home where the incident occurred. The trial court entered summary judgment upon Homeowner's motion, finding as a mat-ter of law that an agency relationship between Homeowner and Melvin did not exist. I agree. Also, I would affirm on the grounds that the incident was not foreseeable and therefore, we cannot impose liability on Homeowner as a matter of law. Homeowner had no reason to anticipate that adults would be playing quick draw. Furthermore, he was not aware that the decedent was in his home. Richard shot Jason with his own gun. Additionally, the actions leading to the accident were horseplay which also precludes liability. *See Rivera v. New Mexico Highway & Transp., Dept.,* 115 N.M. 562, 563–64, 855 P.2d 136, 137–38 (1993).

## DISCUSSION

{39} Plaintiffs argue that summary judgment was improper. Summary judgment is proper when there are no genuine issues of material fact in question and the moving party is entitled to judgment as a matter of law. *Monett v. Dona Ana Sheriff's Posse,* 114 N.M. 452, 454, 840 P.2d 599, 601 (Ct.App. 1992). Summary judgment is only proper when the facts before the court are not in dispute or are sufficiently developed to require no further factual resolution for determination of the central legal issues. *National Excess Ins. Co. v. Bingham,* 106 N.M. 325, 328, 742 P.2d 537, 540 (Ct.App.1987). Once the movant has made a prima facie showing that he is entitled to summary judgment, "the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *Roth v. Thompson,* 113 N.M. 331, 334–35, 825 P.2d 1241, 1244–45 (1992).

{40} The trial court found that the agency relationship necessary to impose liability upon Homeowner did not exist. The trial court granted summary judgment because the actions leading to the accident could not be construed to fall within the scope of employment. Therefore, the trial court could not impute liability to Homeowner.

{41} When no reasonable trier of fact could conclude that an employee is acting in the course and scope of employment, summary judgment is proper. *Rivera,* 115 N.M. at 564, 855 P.2d at 138. Here, there are no

material facts in dispute, and in fact Plaintiffs have conceded this point.

### A. Foreseeability

{42} In New Mexico foreseeability of an injury or harm is an element of negligence. *Martin v. Board. of Ed. of the City of Albuquerque*, 79 N.M. 636, 638, 447 P.2d 516, 518 (1968); *Kelly v.. Montoya*, 81 N.M. 591, 593, 470 P.2d 563, 565 (Ct.App.1970). Negligence includes " 'the concepts of foreseeability of harm to the person injured and of a duty of care toward that person.' " *Calkins v. Cox Estates*, 110 N.M. 59, 62, 792 P.2d 36, 39 (1990) (quoting *Ramirez v. Armstrong*, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983)); *see also* UJI 13–1601 NMRA 1998. This Court may decide the question of negligence and proximate cause if there are no facts presented to allow a reasonable jury to find proximate cause. *Calkins*, 110 N.M. at 65 n. 6, 792 P.2d at 42 n. 6 (citing *Bouldin v. Sategna*, 71 N.M. 329, 378 P.2d 370 (1963)); *see also, Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 101 (1928).

Black's Law Dictionary defines foreseeability as:

> [t]he ability to see or know in advance; *e.g.* the reasonable anticipation that harm or injury is a likely result from certain acts or omissions. In tort law, the "foreseeability" element of proximate cause is established by proof that actor, as person of ordinary intelligence and prudence, should reasonably have anticipated danger to others created by his negligent act. That which is objectively reasonable to expect, not merely what might conceivably occur.

Black's Law Dictionary 449 (6th ed.1990). In *Saiz v. Belen School Dist.*, 113 N.M. 387, 402, 827 P.2d 102, 117 (1992), the New Mexico Supreme Court defined foreseeability. Foreseeability is an "act or failure to act [that] will result in an unreasonable risk of injury." *Id.* Foreseeability, however, is limited to " 'that which is *objectively reasonable* to expect, not merely what might conceivably occur.' " *Van De Valde v. Volvo of America Corp.*, 106 N.M. 457, 459, 744 P.2d 930, 931 (Ct.App.1987) (quoting *Mata v. Clark Equip. Co.*, 58 Ill.App.3d 418, 15 Ill.Dec. 980, 374 N.E.2d 763, 766 (1978)).

{43} Homeowner should not be held liable for an injury caused to a third person, Jason, by his house-sitter's brother, Richard, and by his house-sitter's brother's gun and ammunition. Homeowner did not authorize or encourage Richard to bring his gun into the house; bringing the gun into the house was of no benefit to Homeowner. Homeowner had no knowledge of the propensity Richard and Jason had for playing quick draw.

{44} A reasonably prudent person could not have foreseen that Melvin's failure to care for Homeowner's guns would have caused Jason such an injury. A reasonable person would not anticipate that someone would bring guns into his home. Even more so, a reasonable person would not anticipate that Richard's loaded gun would be used to play a fatal game of quick draw involving Homeowner's unloaded weapon. The guns, the ammunition, and the game of quick draw were intervening causes that Homeowner could not foresee. To expect Homeowner to have anticipated this would be to require every homeowner to anticipate total disaster each and every time they left their home in the care of a house-sitter.

### B. Agency Principles and Respondeat Superior

{45} Even if this accident had been foreseeable, no agency relationship was present in this case. Plaintiffs argue that a principal-agent relationship existed between Melvin, Richard, and Homeowner and that Melvin and Richard were subject to Homeowner's control at the time of the accident. In the alternative, Plaintiffs argue that there are genuine material facts in dispute that would preclude summary judgment. I first address the agency relationship in general. An agency relationship is a mutual agreement between two parties by which one party, the agent, undertakes to act on behalf of another person or entity, the principal, subject to the principal's control. Daniel S. Kleinberger, *Agency and Partnership* §§ 1.1, 3.2 (1995). A subset of an agency relationship is respondeat superior to the employer-employee relationship. Restatement (Second) of Agency § 2 cmt. a (1993). An employer-employee

relationship exists where an individual, the employer, employs the services of another, the employee, to perform services for him or her. The employee may or may not be paid a salary or wages. *See Lai v. St. Peter,* 10 Haw.App. 298, 869 P.2d 1352, 1357 (1994) (defining employee as "one who works for a salary or wages under directions.") (citation omitted); *but see California First Bank v. State,* 111 N.M. 64, 70, 801 P.2d 646, 652 (1990) (stating that an employer-employee relationship may be gratuitous). The employer retains control or the right to control the physical conduct of the other in performance of the service. *See Gallegos v.. Citizens Ins. Agency,* 108 N.M. 722, 729, 779 P.2d 99, 106 (1989); Restatement (Second) of Agency § 220; Black's Law Dictionary 363 (6th ed.1990) (defining employee). Both the principles of agency and respondeat superior may impose liability on a principal or employer for the acts of an agent or employee.

{46} The general rule is that an employer is liable for the torts of an employee committed while the employee is acting within the scope of employment. W. Edward Sell, *Sell on Agency,* 84 (1975) [hereinafter Sell]. To have an employer-employee relationship, the employer must have the right of control and the actions of the employee must have been within the scope of employment. *McCauley v. Ray,* 80 N.M. 171, 180–81, 453 P.2d 192, 201–02 (1968); *Romero v. Shelton,* 70 N.M. 425, 428–29, 374 P.2d 301, 303–04 (1962) (*overruled on other grounds by Archuleta v. Pina,* 86 N.M. 94, 519 P.2d 1175 (1974); Sell, *supra* at 86, 88.

### 1. Right of Control

{47} To determine whether the employer has the right to control the details of the employee's work, we are to consider direct evidence of the employer's power to control the manner and means of the employee's performance, the method of payment of compensation, whether the employer furnishes equipment for the employee, and whether the employer has the power to terminate the employee at will. *Houghland v. Grant,* 119 N.M. 422, 425, 891 P.2d 563, 566 (Ct.App. 1995). The right of control is not just dictating the results to be obtained but it is also

directing "the manner in which the details of the work are to be accomplished." *Triple B. Corp. v. Brown & Root, Inc.,* 106 N.M. 99, 101, 739 P.2d 968, 971 (1987). Additionally, if rules are made to govern the general conduct of a person while on the property of another, conformity to those rules does not establish that the people involved are employees of the person making those rules. *Lai,* 869 P.2d at 1358 (citing *Manchester Avenue Co. v. Stewart,* 50 Cal.2d 307, 313–14, 325 P.2d 457, 461 (1958) (citing Restatement (Second) of Agency § 220 cmt. h (1933)).

{48} In *Lai,* the court determined whether a homeowner's directions to a house-sitter exerted enough control over the house-sitter to establish an employment relationship. The house-sitter's list of duties included directions regarding the

> daily operation of [homeowners] home, such as yard service, bug extermination service, sprinkler system, home appliances, swimming pool care, trash pickup, location of keys, and watering the plants.... Furthermore, the list requested that [housesitter] not wear shoes in the house, sit on the furniture with wet or damp clothes or sweaty bodies, or leave valuables in the car when visiting the beach or other tourist shops.

*Lai,* 869 P.2d at 1358. The court determined that this list of duties was not sufficient for the homeowner to retain control over the house-sitter and therefore, an employer-employee relationship did not exist between the homeowner and house-sitter. *Id.*

### 2. Scope of Employment

{49} To be within the scope of employment means that employee's actions must be done with the intent to "perform a service for the employer." *Benham v. All Seasons Child Care, Inc.,* 101 N.M. 636, 638, 686 P.2d 978, 980 (Ct.App.1984). An act of employment is within the scope of employment if:

1. It was something fairly and naturally incidental to the employer's business assigned to the employee, and

2. It was done while the employee was engaged in the employer's business with the view of furthering the employer's interest and did not arise entirely from some

external, independent and personal motive on the part of the employee.

UJI 13–407 NMRA 1998; *see also Miera v. George,* 55 N.M. 535, 540, 237 P.2d 102, 105 (1951); *Gonzales v. Southwest Security and Protection Agency, Inc.,* 100 N.M. 54, 55, 665 P.2d 810, 811 (Ct.App.1983); *Narney v. Daniels,* 115 N.M. 41, 49, 846 P.2d 347, 355 (Ct.App.1992). Injuries that result from an employee engaging in horseplay are usually not considered within the scope of employment. *Rivera,* 115 N.M. at 563–64, 855 P.2d at 137–38. In *Rivera,* this Court held a spontaneous water fight between two road crew laborers was not within the scope of employment and affirmed the trial court's grant of summary judgment. *Id.* at 566, 855 P.2d at 140. In *Rivera,* it was noted that:

> "The general rule is that an employer is not liable to a customer, patron or other person for an assault arising out of acts of mischief or horseplay indulged in by the employee unless it is shown that the employer was or should have been so aware of the propensities of the employee in that direction as to make him negligent for having retained him in the employ since such acts are not to be considered incidental to the work which he is hired to perform but are of a personal nature, indulged in for the personal amusement of the employee and not in furtherance of the master's interest."

*Id.* at 564, 855 P.2d at 138 (quoting *Lane v. Modern Music, Inc.,* 244 S.C. 299, 136 S.E.2d 713, 717 (1964)). The Court also noted that there are no common law tort cases where an employer was liable when the horseplay was not in some way connected to the employment. *Id.* at 565, 855 P.2d at 139. Finding that the actions of the employee in *Rivera* were horseplay and not within the scope of employment, the Court affirmed the trial court's award of summary judgment for the employer.

{50} This case does not involve an employer-employee relationship. Homeowner did not have the right of control over the manner in which Melvin performed his duties nor was the game of quick draw within the scope of employment. To show control, there must be direct evidence of the power to control the employee's performance, how the employee was compensated, whether the employee's equipment is furnished and if the employer can terminate the employee at will. *Houghland,* 119 N.M. at 425, 891 P.2d at 566. There is no such direct evidence here. Homeowner left only very general instructions for Melvin. There were no guidelines or steps for Melvin to follow. Additionally, there is no evidence that Homeowner paid Melvin or that Homeowner furnished any kind of equipment for him. Homeowner did not direct the manner in which Melvin would accomplish the detail of his work. *See Triple B Corp.,* 106 N.M. at 102, 739 P.2d at 972.

{51} We can analogize this situation to the *Lai* case. The homeowner's instructions for house sitting in *Lai* were much more detailed than those given by Homeowner. The homeowner, in *Lai,* requested that the house sitter refrain from doing many things, such as not wearing shoes in the house or leaving valuables in the car. Homeowner, likewise asked Melvin to refrain from doing certain things but the instructions were not as exhaustive as those in *Lai.* Even with the detailed instructions in *Lai* the court did not find that the homeowner retained control sufficient to establish an employer-employee relationship. Likewise, here, Homeowner did not retain sufficient control over Melvin to establish an employer-employee relationship.

{52} Plaintiffs rely on the proposition that a homeowner who turns over the safekeeping of his home to another creates an employer-employee relationship and that the homeowner is liable for the acts of that person. *State Farm Fire & Cas. Co. v. Miller Metal Co.,* 83 N.M. 516, 494 P.2d 178 (Ct. App.1971). In *State Farm,* the homeowners asked their daughter and son-in-law to watch their house while they were out-of-town. The homeowners called and asked their daughter and son-in-law to prepare their house for the winter, including turning off the air-conditioning and turning on the furnace. The homeowner gave very specific instructions regarding opening the dampers on the furnace, as homeowner knew that if they were not open it would be dangerous. *State Farm,* 83 N.M. at 518, 494 P.2d at 180.

The homeowner's home was subsequently damaged by a fire because the dampers were not open. The Court determined that in this instance the daughter and son-in-law were agents of the homeowner. *Id.* at 519, 494 P.2d at 181. The Court based this determination on the very specific and detailed instructions the homeowner gave to his daughter. *Id.*

{53} Here, Homeowner did not give detailed or specific instructions to the Franklins regarding his home. Homeowner merely told them not to have any wild parties and not to mess with his guns. There were no step-by step instructions left for Melvin and Richard regarding any aspect of caring for Homeowner's home. The instructions given by Homeowner did not create an employer-employee relationship.

{54} Plaintiffs also assert that this is a failure to act case. However, as discussed above, this is not a case involving an employer-employee relationship. The failure to act discussed in § 232 of the Restatement (Second) Agency applies to an employer-employee relationship. Plaintiffs assert that illustration 5 of the Restatement (Second) Agency § 232 is dispositive of this case. That illustration provides:

> 5. P employs A to drive his team. A leaves the team, properly hitched, by the roadside while he enters a tavern for the forbidden purpose of obtaining a drink. While in the tavern, he sees that the horses have become unhitched and are about to run away. He refrains from acting in order to finish his drink. A's conduct is negligent and within the scope of employment.

First, the Plaintiffs' argument presupposes that Melvin knew that this game of quick draw was occurring, that Richard's gun was loaded, and that, despite this knowledge, he continued to watch the Super Bowl. There is no evidence to support this supposition. Melvin stated that he had never seen the boys playing quick draw. In fact, Melvin never saw the game of quick draw nor the shooting occur. The Majority is inferring from where they believe Melvin was in the room, which is unclear, that he knew they were playing quick draw. The Majority mis-

perceives the facts and from this draws an impermissible inference. *Spectron Dev. v. American Hollow,* 1997–NMCA–025, ¶ 32, 123 N.M. 170, 936 P.2d 852 (stating that " '[we] review the case litigated below, not the case that is fleshed out for the first time on appeal.' " (quoting *In re T.B.,* 121 N.M. 465, 469, 913 P.2d 272, 276 (Ct.App.1996)); *Butler v. Hoover Nature Trail, Inc.,* 530 N.W.2d 85, 88 (Iowa Ct.App.1994) (stating "[a]n inference based on speculation or conjecture does not generate a material factual dispute[.]").

{55} Second, in the Restatement illustration the instrumentalities that would cause any harm, the horses, are the exact thing for which the agent was responsible. There is a nexus between the negligence, allowing the horses to become unhitched, and the agent's employment, driving the horses. Here, such a nexus does not exist. Homeowner instructed Melvin not to let anyone touch his guns because they are his prized possessions, not out of fear of someone being shot in his home. Additionally, Homeowner did not absolutely forbid anyone from touching his guns. He gave Melvin permission to use them. The Majority argues that Homeowner was concerned about some kind of negligence occurring in his home and that this is evidenced by Homeowner calling to inquire about his guns. However, Melvin stated that he may have inquired about his guns and continually qualified his statements in this manner. Further, the instrumentality of the accident here was Richard's gun, not one of Homeowner's guns. Therefore, there is not a nexus between safeguarding Homeowner's guns and Jason being shot with Richard's gun.

{56} Even if I was to determine that there was an employer-employee relationship, the activities engaged in at the time of the accident were clearly outside the scope of employment. The specific activity of quick draw can only be characterized as horseplay. Horseplay is not within the scope of employment and is not in furtherance of the interest of an employer. *Rivera,* 115 N.M. at 563, 855 P.2d at 137.

### 3. Agency

{57} Generally, a principal will not be liable for the unauthorized negligent or willful conduct of a non-employee agent even if such conduct causes harm to third parties. A non-employee agent is one who is not subject to the right of control of the principal as to the manner of performing the object of the agency. The principal will only be liable if he authorized the conduct of the agent. Restatement (Second) Agency § 250 (1993); Sell, *supra* at 95 (citing *Southern Nat'l Ins. Co. v. Williams,* 224 Ark. 938, 277 S.W.2d 487 (1955)).

{58} The New Mexico Supreme Court has recognized a distinction between an employer-employee relationship and a principal-agent relationship. *Romero,* 70 N.M. at 428–29, 374 P.2d at 303–04; *Jaramillo v. Thomas,* 75 N.M. 612, 614–15, 409 P.2d 131, 132–33 (1965). All principals are not employers, nor are all agents employees. *Romero,* 70 N.M. at 428–29, 374 P.2d at 303. A non-employee agent's physical actions are not subject to the direct control of the principal. *Id.* at 429, 374 P.2d at 304. Only when the principal controls the details and manner of performance of the agent does the principal become liable for the physical conduct of the agent. *Jaramillo,* 75 N.M. at 614, 409 P.2d at 132–33.

{59} As discussed above, Homeowner did not retain control over Melvin. As such, Melvin's relationship to Homeowner can only be characterized as that of a non-employee agent. Therefore, I would not hold Homeowner liable for the unauthorized conduct of Melvin, a non-employee agent.

### C. Policy

{60} Determining that an agency relationship exists and that liability can be imposed upon a homeowner under the circumstances of this case expands agency liability to include a ridiculous number of situations. For example, liability could be imposed on a homeowner who gave instructions to a house-sitter not to allow any one to play with the homeowner's dog and subsequently someone visits house-sitter and is bitten by the neighbor's dog. Or, liability could be imposed on a homeowner who gave instructions not to touch his fifty-year-old bottle of scotch and subsequently someone brings their own alcohol over, drinks it, gets alcohol poisoning and dies. There is simply no connection between the instructions in these scenarios and the instrumentality causing the harm. The same is true in this case. There is no connection between Homeowner instructing Melvin not to let anyone touch his guns and Jason being shot by Richard's gun.

{61} Additionally, imposing liability in a case as tenuous as this creates a standard of strict liability. Any time a homeowner leaves their home in the care of another, they are automatically liable for any accident on their property, foreseeable or not. This standard of strict liability sends a clear message to the insurance companies that they must revise homeowners' policies to encompass this new development. We should not send this message.

{62} This is not to say that individuals with meritorious claims do not deserve their day in court. Indeed, we have a solemn duty to uphold this premise. However, we also have an equally solemn duty to protect the rest of the public from unjustifiably being involved in litigation which is based on an erroneous interpretation of the law.

### CONCLUSION

{63} The actions of Richard and Jason were not foreseeable, there are no facts to show that Melvin was an employee of Homeowner, and there are no material facts in dispute. Homeowner is, therefore, entitled to judgment as a matter of law. Accordingly, I would affirm the trial court's grant of summary judgment. The majority having decided otherwise, I must respectfully dissent.