1999-NMSC-042

992 P.2d 268

Ronald Dale MADSEN and Terrisa Ruth Madsen, individually and as personal representatives of the Estate of Jason Madsen, deceased, Plaintiffs–Respondents,

v.

Shawn D. SCOTT, Defendant–Petitioner.

No. 25,218.

Supreme Court of New Mexico.

Nov. 3, 1999.

**256**

Atwood, Malone, Turner & Sabin, P.A., Robert E. Sabin, Victoria Davis Armstrong, Roswell, for Petitioner.

Tucker Law Firm, P.C., Steven L. Tucker, Santa Fe, for Respondents.

**OPINION**

SERNA, Justice.

{1} Ronald and Terrisa Madsen, Plaintiffs, are suing Shawn Scott, Defendant–Homeowner, for the death of their son, Jason. The trial court granted summary judgment for Homeowner, finding that there was no genuine issue of material fact and that there was no principal-agent relationship between Homeowner and his house-sitter, Melvin Franklin. A majority of the Court of Appeals reversed, *Madsen v. Scott,* 1998–NMCA–092, 125 N.M. 475, 963 P.2d 552, and we granted Homeowner's petition for writ of certiorari to the Court of Appeals. We conclude that Homeowner was not an employer

or principal and that the accident was unforeseeable. Thus, we reverse the Court of Appeals and affirm the trial court's grant of summary judgment.

**Facts and Background**

{2} In January of 1992, Homeowner decided to visit his father in another state, and he asked Melvin Franklin, a friend and coworker, to housesit for him. Homeowner gave Melvin general instructions to care for his house, including watering his plants, as well as general rules of conduct, including not letting anyone touch his guns and not throwing wild parties. Homeowner called on one occasion, asking Melvin if anyone had burglarized his house or handled his weapons, and Melvin asked Homeowner if Melvin's brother, Richard Franklin, could stay at the residence. Homeowner agreed that Richard could stay at his house.

{3} Homeowner, Melvin, Richard, and Jason all had an interest in guns, and Homeowner owned several guns. Homeowner's guns were located at the residence, unsecured and unloaded, and there was no ammunition belonging to Homeowner at the residence during his absence.

{4} Richard brought his own weapon, a .38 caliber handgun, and his own ammunition to Homeowner's residence. Homeowner gave permission to the brothers to have guests. Jason, without the knowledge and specific consent of Homeowner, was staying at Homeowner's house at the invitation of Melvin or Richard. On January 26, 1992, Melvin and Richard had several people at Homeowner's house for a party, including Jason. Melvin was sitting on the floor, watching a game on television, and Richard and Jason were behind him, playing a game of "quick draw," with Richard using his own .38 and Jason using Homeowner's unloaded .22. Richard believed his .38 to be unloaded, but it contained at least one bullet, which killed Jason during this game of quick draw.

{5} Plaintiffs sued both Richard and Homeowner, alleging that Melvin and Richard were Homeowner's employees, agents or servants, that Melvin negligently failed to control and supervise the use and misuse of

weapons in the house by Richard and Jason, and that Homeowner was vicariously liable for the negligence of Melvin and Richard. The district court found that there was no genuine issue of material fact and that no principal-agent relationship existed between Homeowner and Melvin.

{6} A majority of the Court of Appeals reversed the trial court's grant of summary judgment, holding that genuine issues of material fact exist regarding whether an employer-employee relationship was created between Homeowner and Melvin, whether Melvin was acting within the scope of his employment when he "failed to act," and whether this type of accident was foreseeable. *Madsen*, 1998–NMCA–092, ¶ 36, 125 N.M. 475, 963 P.2d 552. On certiorari, Homeowner argues that the house-sitting arrangement did not constitute an employment relationship, that Melvin's conduct did not occur in the scope of any such relationship, and that, as a matter of law, the accident was not foreseeable to Homeowner.

## Standard of Review

{7} If there are no genuine issues of material fact or the moving party is entitled to judgment as a matter of law, an award of summary judgment is proper. *Carmona v. Hagerman Irrigation Co.*, 1998–NMSC–007, ¶ 7, 125 N.M. 59, 957 P.2d 44. On appeal, this Court considers the facts in the light most "favorable to support a trial on the issues because the purpose of summary judgment is not to preclude a trial on the merits if a triable issue of fact exists." *Ruiz v. Garcia*, 115 N.M. 269, 271, 850 P.2d 972, 974 (1993). Once Homeowner, as the movant, has made a prima facie showing that he is entitled to summary judgment, "the burden shifts to the party opposing the motion to demonstrate the existence of specific evidentiary facts which would require trial on the merits." *See Roth v. Thompson*, 113 N.M. 331, 335, 825 P.2d 1241, 1245 (1992).

## Discussion

### Employment Relationship

{8} The first issue is whether Melvin was an agent of Homeowner, and whether Homeowner and Melvin's house-sitting arrangement constituted an employer-employee relationship. "An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation." UJI 13–401 NMRA 1999. If Melvin was Homeowner's agent, Homeowner may be liable for Melvin's negligent acts if Melvin was acting within the scope of his agency and Homeowner had the right to control the manner in which the details of the work were to be performed at the time of the accident. *See* UJI 13–402 NMRA 1999.

{9} As the *Madsen* majority noted, the Restatement (Second) of Agency § 220(1) (1958), expresses that "[a] servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control." *See Madsen*, 1998–NMCA–092, ¶ 12, 125 N.M. 475, 963 P.2d 552; *see also Romero v. Shelton*, 70 N.M. 425, 428, 374 P.2d 301, 303 (1962), *overruled on other grounds by Archuleta v. Pina*, 86 N.M. 94, 95, 519 P.2d 1175, 1176 (1974). This Court has noted that "[p]rinciples of respondeat superior apply when the claim is based in tort and the plaintiff alleges the employer is liable for the conduct of an employee because the employee was acting within the scope of employment." *Romero v. Mervyn's*, 109 N.M. 249, 254, 784 P.2d 992, 997 (1989). "Where the material facts are undisputed and susceptible of but one logical inference, it becomes a conclusion of law as to whether the status of an employer-employee relationship exists." *Jelso v. World Balloon Corp.*, 97 N.M. 164, 167, 637 P.2d 846, 849 (Ct.App. 1981).

{10} In support of its conclusion that an employer-employee relationship existed in this case, the *Madsen* majority relied in part upon *State Farm Fire & Casualty. Co. v. Miller Metal Co.*, 83 N.M. 516, 494 P.2d 178 (Ct.App.1972). *Madsen*, 1998–NMCA–092, ¶ 22, 125 N.M. 475, 963 P.2d 552. In *State Farm*, husband and wife homeowners left their house vacant but gave a key to their

daughter and son-in-law and requested that they prepare the house for winter, giving specific instructions to winterize the home and open the dampers on the furnace. 83 N.M. at 518, 494 P.2d at 180. There was testimony that the furnace would overheat to up to 400 degree if the dampers were not opened, and in fact, a fire which began at or near the furnace damaged the house. *Id.* A majority of the Court of Appeals in *State Farm* upheld the trial court's determination that the "doctrine of respondeat superior applies and the acts or omissions of the [the daughter and son-in-law] were imputed to the [homeowners]," because the homeowners "gave specific, detailed instructions to [their] daughter for winterizing the home." *Id.* at 520, 494 P.2d at 182. Comparing *State Farm* to the present case, the *Madsen* majority stated:

> Just as the injury in [*State Farm*] was precipitated by the housesitter's failure to follow the involved instructions regarding the furnace, the injury in this case may be viewed as precipitated by the housesitter's failure to follow the less involved, but nonetheless specific, instruction not to let anyone touch the guns. Thus, it may be said that a master-servant relationship exists with respect to the very thing from which the injury arose....

*Madsen,* 1998–NMCA–092, ¶ 22, 125 N.M. 475, 963 P.2d 552 (citation and quotation marks omitted). We respectfully disagree with the majority's assessment of the facts. Jason's death was caused, not by Melvin's failure to follow Homeowner's instruction not to let anyone handle his guns, but by Richard bringing a loaded weapon into Homeowner's house and by Richard and Jason engaging in a game of "quick draw." As Judge Alarid notes in his dissent, there is no nexus between Melvin's safeguarding of Homeowner's guns and Richard shooting Jason with his own gun and ammunition. *See Madsen,* 1998–NMCA–092, ¶ 55, 125 N.M. 475, 963 P.2d 552 (Alarid, J., dissenting).

{11} Homeowner argues that this case is more similar to *Lai v. St. Peter,* 10 Haw.App. 298, 869 P.2d 1352 (1994), a proposition which the majority rejected. *Madsen,* 1998–NMCA–092, ¶ 22, 125 N.M. 475, 963 P.2d

552. In *Lai,* the plaintiffs sued a homeowner under the theory of respondeat superior following an automobile accident involving the homeowner's car, which was driven by his cousin. 869 P.2d at 1356. The cousin stayed at the homeowner's residence while he was out of town, and the homeowner left a list which described daily operation of the house and requested that the cousin water the plants. *Id.* at 1358. The list also requested that no one sit on the furniture with wet clothes, wear shoes in the house, or leave valuables in the car when visiting tourist destinations. *Id.* In *Lai,* the court stated that "[i]t has been recognized that '[i]f rules are made only for the general control of conduct of a person while on the premises of another, mere conformity to such rules does not indicate or establish that the persons involved are employees of the person making the rules.'" *Id.,* at 1358 (quoting *Manchester Ave. Co. v. Stewart,* 50 Cal.2d 307, 325 P.2d 457, 461 (1958)). The *Madsen* majority determined that *Lai* is distinguishable because the homeowner "did not appear to require the housesitter to do anything affirmatively for the homeowner other than water the plants," and the remainder of the "list contained information regarding the daily operation of the home" and rules governing the conduct of the house sitter while she stayed at the home. *Madsen,* 1998–NMCA–092, ¶ 16, 125 N.M. 475, 963 P.2d 552. We disagree and conclude that Homeowner's requests that Melvin and Richard not host wild parties or handle his guns are more similar to general rules of conduct rather than specific affirmative duties. *See Lai,* 869 P.2d at 1358 ("The list in question merely established rules of conduct for guests on [the homeowner's] premises."). We agree with the Hawaii Court of Appeals that mere conformity to household rules does not establish an employee-employer relationship.

{12} In a recent Wyoming case somewhat similar to the present matter, defendant-homeowners asked their son to house sit, which included watering the plants, retrieving the mail and newspapers, and feeding the cats. *See Austin v. Kaness,* 950 P.2d 561, 563 (Wyo.1997). Although the homeowners allowed their son to have guests, they limited the number of guests and forbid alcohol con-

sumption within the house. *Id.* The son allowed a friend to have a party at his parents' house, and alcohol was consumed. *Id.* A minor, after drinking alcohol at this party, drove home and caused a car accident which injured the plaintiff, who then sued the homeowners based on the theory of respondeat superior and agency. *Id.* The Supreme Court of Wyoming concluded that a son, house-sitting for his parents, was not an employee. *Id.* The court reasoned that "[t]he record supports nothing more than a finding that [the house sitter] was doing a favor for his parents, as anyone might do for a family member or friend." *Id.*

{13} We conclude that this case is more analogous to *Lai* and *Austin* than *State Farm.* Homeowner gave Melvin general instructions to water the plants and keep an eye on the house. Homeowner expressed rules to limit the conduct of the brothers while on his premises, such as not allowing wild parties and not allowing anyone to handle his guns. Similarly, in *Lai,* instructions given by the homeowner concerned the conduct of guests rather than specific, detailed instructions regarding servicing of an appliance, as in *State Farm.* Neither mere conformity to some of the instructions nor noncompliance with other rules establish that Melvin or Richard are employees of Homeowner.

{14} The *Madsen* majority also relied on W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 70, at 501 (5th ed.1984) (footnotes omitted):

> The traditional definition of a servant is that he [or she] is a person employed to perform services in the affairs of another, whose physical conduct in the performance of the service is controlled, or is subject to a right of control, by the other.
>
> This is, however, a great over-simplification of a complex matter. In determining the existence of "control" or the right to it, many factors are to be taken into account and balanced against one another—the extent to which, by agreement, the employer may determine the details of the work; the kind of occupation and the customs of the community as to whether the work usually is supervised by the employer; whether

the one employed is engaged in a distinct business or occupation, and the skill required of him [or her]; who supplies the place and instrumentalities of the work; the length of time the employment is to last; the method of payment, and many others.

*Madsen,* 1998–NMCA–092, ¶ 19, 125 N.M. 475, 963 P.2d 552; *accord Houghland v. Grant,* 119 N.M. 422, 425, 891 P.2d 563, 566 (Ct.App.1995) (discussing a test to determine whether an employer-employee relationship exists based on the extent to which the employer controls or has the right to control the details of the employee's work, and taking into consideration evidence of the employer's power to control the manner of performance by the employee, the method of payment of compensation, whether the employer furnishes equipment, and whether the employer has the power to terminate the employee at will). While the *Madsen* majority discussed some of these factors, most of these elements support Homeowner's position. Homeowner did not determine details of how Melvin was to carry out the house sitting task beyond general instructions to water plants and keep an eye on the residence. Asking a friend or acquaintance to house sit requires little or no skills on the part of the house-sitter, and is not typically an occupation or business. Homeowner had planned on remaining in Arkansas for no more than one month; thus, the length of Melvin's task was short. Homeowner did not pay Melvin to housesit. Although lack of remuneration is not determinative of this issue, it does support Homeowner's argument that no employee-employer relationship was contemplated. Additionally, there was no contract between Homeowner and Melvin, which is relevant, though not dispositive, because the employer's right to control typically arises under a contract for employment. *See California First Bank v. State,* 111 N.M. 64, 69–70, 801 P.2d 646, 651–52 (1990). Judge Alarid also noted that there was no direct evidence of Homeowner's power to control Melvin's performance and no evidence of compensation. *Madsen,* 1998–NMCA–092, ¶ 50, 125 N.M. 475, 963 P.2d 552 (Alarid, J., dissenting). The only enumerated factor which supports Plaintiffs is that

Homeowner supplied the place of "work," an integral component of all house-sitting arrangements.

{15} House-sitting requires little or no skills, and is not usually an occupation or business. Homeowner did not pay Melvin, enter into a contract with him, or give him detailed instructions regarding care of the house which would indicate that Melvin's performance of the services was subject to Homeowner's control or right to control. Further, there is no nexus between Homeowner's instruction not to let others handle his unloaded guns and the instrumentality of the injury, Richard's own loaded weapon, which was neither contemplated nor authorized by Homeowner. We conclude that Homeowner and Melvin did not form an employer-employee relationship. Because we conclude that no employer-employee relationship existed, we need not reach the question of whether Melvin was acting within the scope of employment when the accident occurred.

### Foreseeability

■ {16} The *Madsen* majority held that "[t]here are also issues of material fact raised as to whether Homeowner could have foreseen that someone could be injured by a gun." *Madsen*, 1998–NMCA–092, ¶ 34, 125 N.M. 475, 963 P.2d 552. The majority noted that Homeowner knew that Melvin and Richard had an interest in guns, and because of this interest, one could reasonably "infer that Homeowner knew or should have known that by giving permission for Richard to stay at the house, he might bring along some of his own guns, some of which might be loaded." *Id.* The majority then observed that Homeowner expressly gave Melvin and Richard permission to have guests, without prohibiting the brothers from bringing their guns and ammunition into the house. *Id.* ¶ 35.

■ {17} Homeowner gave permission to Melvin and Richard to have guests in his home during his absence. Thus, Homeowner owes Jason, a visitor, "the duty to use ordinary care to keep the premises safe for use by the visitor." UJI 13–1309 NMRA 1999. Homeowner took reasonable steps, including unloading his weapons and assuring that no ammunition was in the house before he left, to keep the premises safe for visitors. "An 'act, to be 'negligence', must be one which a reasonably prudent person would foresee as involving an unreasonable risk of injury to ... another and which such a person, in the exercise of ordinary care, would not do." UJI 13–1601 NMRA 1999. By introducing evidence which merely shows that Homeowner allowed individuals with an interest in guns to housesit and have guests, we conclude that, even viewing the evidence in a light most favorable to support a trial on the merits, Plaintiffs have failed to raise a genuine issue of fact that Homeowner failed to use ordinary care.

■ {18} Judge Alarid noted that "[i]n New Mexico foreseeability of an injury or harm is an element of negligence," and that foreseeability is " '[t]hat which is objectively reasonable to expect, not merely what might conceivably occur.' " *Madsen*, 1998–NMCA–092, ¶ 42, 125 N.M. 475, 963 P.2d 552 (Alarid, J., dissenting) (quoting Black's Law Dictionary 449 (6th ed.1990)). Judge Alarid concluded, and we agree, that Homeowner did not authorize or encourage Richard to bring his gun into his house and that this action did not benefit Homeowner in any way. *Id.* ¶ 43. Further, Judge Alarid concluded that "a reasonable person would not anticipate that Richard's loaded gun would be used to play a fatal game of quick draw involving Homeowner's unloaded weapon.... To expect Homeowner to have anticipated this would be to require every homeowner to anticipate total disaster each and every time they left their home in the care of a housesitter." *Id.* We agree.

### Conclusion

{19} We conclude that because Homeowner gave general, nonspecific instructions to Melvin, because Melvin was not compensated, because house-sitting is not usually an occupation or business and requires no particular skills, and because no contract was created, there was no employer-employee relationship between them. Further, there is no connection between Homeowner's instruction not to let others handle his guns, all of which were unloaded, and the instrumentali-

ty of the injury, Richard's own loaded weapon. As a matter of foreseeability and as a matter of policy, we conclude that the homeowner cannot be held responsible under the evidence presented by Plaintiffs. We reverse the Court of Appeals and affirm the trial court's grant of summary judgment for Homeowner.

{20} **IT IS SO ORDERED.**

MINZNER, C.J., BACA, FRANCHINI and MAES, JJ., concur.